Robert HENRY, Attorney General
of Oklahoma, Appellant,

v.

CORPORATION COMMISSION OF the
STATE OF OKLAHOMA, and Arkansas
Oklahoma Gas Corporation, Appellees.

ARKANSAS OKLAHOMA GAS
CORPORATION,
Appellant,

v.

The STATE of Oklahoma and
The Oklahoma Corporation
Commission, Appellees.

The EASTERN OKLAHOMA LEGISLA-
TIVE DELEGATION, Senators Gene
Stipe and Larry Dickerson, Representa-
tives Don Mentzer, Ron Glenn, Chester
(Dusty) Rhodes and Jim Hamilton, Ap-
pellants,

v.

CORPORATION COMMISSION OF the
STATE OF OKLAHOMA, and Arkansas
Oklahoma Gas Corporation, Appellees.

Nos. 68776, 68793 and 68795.

Supreme Court of Oklahoma.

Oct. 2, 1990.

Rehearings Denied March 2, 1992.

Robert H. Henry, Atty. Gen., pro se and Robert A. Butkin, Asst. Atty. Gen., Oklahoma City, for appellant Atty. Gen. of Oklahoma.

José J. Hernandez, Oklahoma Corp. Com'n, Oklahoma City, for appellee Oklahoma Corp. Com'n.

William L. Anderson and Cody B. Waddell, Anderson & Waddell, P.C., Oklahoma City, for appellee/appellant Arkansas Oklahoma Gas Corp.

Representative Jim Hamilton, Poteau, for appellant Eastern Oklahoma Legislative Delegation.

LAVENDER, Justice.

The issues presented on appeal are 1) did AOG's customers have sufficient notice of the Commission's intent to increase AOG's base cost of gas and line loss and 2) is the Commission's order increasing the amount of refund owed AOG's customers a valid order. We hold that the Commission's notice was insufficient to adequately inform AOG's customers that an increase in line loss or base cost of gas was to be considered. We further find that the Commission's order increasing the amount of refund owed AOG's customers is valid in that AOG waived its right to challenge the order on appeal having failed to contest the staff's motion during the Commission's proceedings.

## I. Facts

On December 26, 1985, Arkansas Oklahoma Gas Corporation (AOG), a gas utility serving certain communities and rural areas in Sequoyah, LeFlore and Haskell counties in Oklahoma, filed an application with the Oklahoma Corporation Commission seeking a general rate increase. The Corporation Commission designated this application as Public Utility Docket Cause No. 79. On April 24, 1986, the Eastern Oklahoma Legislative Delegation (EOLD), as representatives of the customers of AOG, filed a protest to the application for an increase in utility rates. In May of the same year the Attorney General of Oklahoma also filed an intervention as to the application for rate increase as representative of the public.

On April 24, 1986, the same date that EOLD entered its appearance in the general rate increase proceeding initiated by AOG, the Commission staff filed an application which was designated as Public Utility Docket Cause No. 158. In the application in Cause No. 158, the Commission staff alleged that in the course of monitoring AOG's compliance with Commission

Rules and Regulations governing fuel adjustment clauses [1] it had discovered that AOG was recovering line loss [2] through the purchased gas adjustment clause.[3] The application alleged that this recovery was not permissible through this mechanism.[4] Because AOG had a seven and one-half percent line loss factored into its base rates under the previous Commission order establishing general rates, the recovery of actual line loss through the purchased gas adjustment clause had resulted in an overrecovery of fuel costs. The application sought an order from the Commission directing a refund to AOG's customers. Additionally, the application requested that AOG's gas costs be rebased. No mention was made that an increase in line loss was to be considered or that other appropriate relief would be considered.[5]

A hearing was set on the staff application in Cause No. 158 and notice was mailed to counsel for AOG and to the Attorney General. No other notice was given as to the hearing in this matter. The hearing was held on May 6, 1986. The Commission entered Order No. 297572 which directed AOG to refund to its customers an amount in excess of $400,000, the exact amount to be determined at a later time, plus interest at the rate of six percent during the course of billing over the next twelve months. The order also allowed AOG to rebase its gas costs from $1.41 per MCF to $2.05 per MCF and to increase the line loss factor in its rate base from seven and one-half percent to eleven percent effective in its May 1986 billings.

On January 21, 1987, the Commission staff filed an application to increase the amount of refund determined in Cause No. 158. This application, however, was filed under Cause No. 79. A copy of this motion was therefore delivered to all parties having entered appearances in the general rate proceeding. As a result EOLD was given actual notice of this application and of the subsequent order setting a hearing date for the motion.

However, on January 15, 1987 EOLD had already filed a motion in Cause No. 79 challenging the proceedings as to the May 6, 1986 hearing on the grounds of lack of notice to the public. EOLD amended this motion on February 19, 1987 to more particularly challenge the lack of notice, and requested a cancelation of that part of Order No. 297572 which allowed AOG to increase its rates. The Attorney General filed a motion in support of the position of EOLD on February 23, 1987. The Attorney General challenged the order on the basis of lack of notice of the intent to consider increasing AOG's line loss factor, as well as raising questions of evidentiary support and Commission authority to take

---

1. *See* 17 O.S.1981 §§ 250–63.

2. Line loss is gas which is lost through the gas companies lines in its transmission. This loss is passed on to the customer by determining the percentage of gas lost in transmission and allowing for that cost to be passed on to the consumer. In this case, it appears that AOG's line loss was primarily due to leaks in AOG's distribution system.

3. 17 O.S.1981, § 250(5) defines fuel adjustment clause as:
   'Fuel adjustment clause' means any mechanism which allows a public utility or electric generating cooperative to automatically adjust its charges above or below the base amount included in its rates, based upon changes in costs of fuel for generation of electricity, purchased power or purchased gas....

4. *See* 17 O.S.1981, § 251(C)(4).

5. The Commission argues that though the application did not specifically say that re-basing of the line loss would be considered, the application did state that the Commission would consider such other relief as it deemed appropriate. However, as the attorney for the Commission pointed out, regrettably this language was left out of the notice issued by the Commission. We assume the Commission argues this point given the holding of *Chickasha Cotton Oil Co. v. Corporation Comm.*, 562 P.2d 507 (Okla.1977), which found that the notice issued was not misleading because the "boilerplate" language mentioned above was included in the notice. However, this case offers no support for the present case wherein the Commission failed to include the language in the notice that "other relief might be considered," and moreover, where the notice was itself defective.

the action of increasing AOG's rates to its consumers under this procedure.

In Order No. 310988 the Corporation Commission granted the staff application to increase the refund, ordering AOG to refund an additional $126,615 plus interest to AOG's customers. The Commission denied EOLD's and the Attorney General's requests to delete the rate increase provisions of Order No. 297572.

The Attorney General, EOLD and AOG have each filed separate appeals from Commission Order No. 310988. The Attorney General challenges the adequacy of the notice received as to Cause No. 158. EOLD challenges the validity of Order 297572 because of the failure to give notice to the public which EOLD represents. AOG challenges the increase in the refund it must make to its customers. All three appeals have been consolidated for disposition. We address first the challenge brought by EOLD as to the validity of Order No. 297572 and ultimately, the correctness of Order No. 310988.

## II.

■ EOLD argues that the provisions of Order No. 297572 allowing a rate increase, i.e. the allowance of increased line loss factor and base gas costs, are invalid because the Commission failed to give notice to the consumers affected by the increase. This Court has held that "rate making" being a legislative power ... "judicial due process notice and hearing ... unless specifically required by statute ..." [6] are not required. While EOLD does not cite a statutory basis for its contention, it does claim that notice was required under the Oklahoma Constitution Art. IX § 18. However, these constitutional provisions provide for publication notice only in a situation where the Commission is engaged in general actions not directed at any named utility. Here the action involved a named utility and therefore that portion of Art. IX § 18 relied on by EOLD has no application.[7]

■ EOLD also argues that the Corporation Commission Rule of Practice 8–27(b) requires that notice of the application in Cause No. 158 be given to the consuming public. Rule 8–27(b) provides:

Notice of hearing of an application for approval of any schedule, rate, charge, classification, rule or regulation which will directly or indirectly alter charges made for services performed, shall be published once each week for two (2) consecutive weeks at least fifteen (15) days prior to a hearing in a newspaper of general circulation published in each county in which are located utility customers affected thereby, unless the Commission directs otherwise.

AOG and the Commission argue that Rule 8–27(b) does not apply in this situation because Order No. 297572 resulted in a decrease in revenue to AOG. We find no merit in this argument since the rule applies to cases where there is any *alteration* made in the charges. Here the order clearly resulted in an alteration in charges made to the consumers of AOG's services. Moreover, the testimony of the Commission's witness at the February 24, 1987 hearing was to the effect that the increase in line loss factor and the increase in cost of gas to be recovered resulted in a rate increase to AOG.[8]

■ Alternatively, AOG and the Commission contend that Rule 8–27(b) has been satisfied because, by failing to explicitly order that publication of notice be given, this had the effect of directing that publication need not be given. We disagree. The Commission's failure to act is no substitution for an express mandate to perform a particular duty.

■ In considering this challenge on appeal as to the adequacy of notice, our standard of review is determined by Art.

**6.** *Chickasha Cotton Oil Co.,* 562 P.2d at 509 (quoting *Southern Oil Corp. v. Yale Natural Gas Co.,* 89 Okla. 121, 214 P. 131 (1923).

**7.** *Id.*

**8.** Record at 94.

IX § 20 Constitution of Oklahoma which states that:

"The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. *In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence.* Upon review, the Supreme Court shall enter judgment, either affirming or reversing the order of the Commission appealed from...."

(emphasis added).

Under the facts of the present case, it is clear that the Commission has not "regularly pursued its authority" or that "the findings and conclusions of the Commission are sustained by the law and substantial evidence." [9] The failure to notify the consumering public as to the Commission's intent to increase AOG's line loss and base gas costs does not substantially comply with the Commission's own rule.

■ The Oklahoma Corporation Commission is constitutionally empowered with the authority to make rules governing procedure and practice before the Commis-

sion.[10] These rules, regulations, and standards adopted by the Commission have the force and effect of law.[11] When an administrative agency such as the Commission promulgates rules to govern its proceeding these rules must be scrupulously observed. Once the agency creates procedural rules it denies itself the right to violate these rules, and an action taken in violation of these procedural rules will be stricken down by the courts.[12] This doctrine was announced in the case of *United States ex rel. Accardi v. Shaughnessy*.[13]

■ It is of no significance that the procedural rule here established by the Commission is more generous than that required by constitution or by statute.[14] The Commission's failure to follow its own procedural rule vitiate such actions where prejudice results.[15]

The Commission's position that its silence as to the requirement that notice be published in this case constitutes a proper exercise of the Commission's discretion retained under rule 8–27(b) is simply untenable. The Commission's position seems to be that notice under 8–27(b) is a matter of administrative grace rather than a right established by a rule having the force and effect of law. This position cannot be reconciled with the fundamental principle that "ours is a government of laws and not of men." [16]

■ If the Commission wishes to make an exception to the application of a rule which speaks in mandatory and unambiguous language it must reasonably explain

9. Okla. Const. art. IX, § 20.

10. *Halpin v. Corporation Comm.*, 575 P.2d 109, 111 (Okla.1978).

11. *Barnes v. Transok Pipeline Co.*, 549 P.2d 819, 820 (Okla.1976).

12. *United States v. Heffner*, 420 F.2d 809, 811 (4th Cir.1969); *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir.1981); *Atlantic Richfield Co. v. Federal Trade Comm.*, 398 F.Supp. 1, 12 (S.D.Tex. 1975); *Douglas County Welfare Administration v. Parks*, 204 Neb. 570, 572, 284 N.W.2d 10, 11–12 (1979). *Accord Halpin*, 575 P.2d at 111.

13. 347 U.S. 260, 265–67, 74 S.Ct. 499, 502–03, 98 L.Ed. 681 (1954).

14. *Heffner*, 420 F.2d 809, 812; *Hall*, 660 F.2d 116, 119; *Hammond v. Lenfest*, 398 F.2d 705, 715 (2nd Cir.1968); *United States v. Green*, 344 F.Supp. 474, 479 (E.D.Pa.1972).

15. *Hall*, 660 F.2d at 119; *Green*, 344 F.Supp. at 479.

16. *Hammond*, 398 F.2d at 715.

the reasons for making the exception.[17] The purpose of the *Accardi* doctrine is "to prevent the arbitrariness which is inherently characteristic of an agency's violation of its own procedures."[18] Any deviation from a procedural rule must be explained on the record to insure that the deviation is not made arbitrarily and capriciously.

◼ Here the Commission's failure to give publication notice to AOG's customers of its intent to increase AOG's line loss and base gas costs in cause no. 158 clearly violated OCCRP 8–27(b). As a result of this violation, the customers were denied the opportunity to present arguments relevant to these changes which would affect the charges made by AOG for the services provided. This prejudiced the interests of these customers. The Commission presented no creditable explanation as to its failure to comply with its own procedural requirement. Accordingly we find the Commission erred in refusing to grant EOLD its requested relief in Order No. 310988 and therefore Order No. 297572 is struck down insofar as it granted any increase to AOG's base gas costs or line loss factor. Our decision on this point effectively moots the issue raised in the appeal by the Attorney General.[19]

### III.

◼ AOG in its separate appeal argues that Order No. 310988 is erroneous insofar as it increases the amount of refund it must make for prior overcharges. AOG challenges the validity of this order on several grounds. We find it unnecessary however, to respond to the various arguments presented as it is apparent from the record that AOG was given an opportunity to present its arguments as to the merits of the refund or procedural irregularities during the Commission's proceedings held on February 24, 1987, but failed to do so.[20] AOG did cross examine the Commission's witness as to what time frame the Commission was using for interest charges given it was the Commission who failed to determine in the original order the correct amount of refund owed to AOG's customers.[21] At no time however, did AOG challenge the legal theory which formed the basis for the original refund and additional refund, or the Commission's authority to issue such a refund. Indeed, as to the original award, AOG waived its right to any notice, or hearing and agreed that the Commission could enter such order as it deemed appropriate based on the Commission's staff investigation and this at a time when the final amount of refund owed was as yet undetermined.[22]

We thus reverse that part of Order No. 310988 that failed to grant EOLD's request to delete the rate increase provision of Order No. 297572. We affirm however, that portion of the Order allowing for the increase in refund owed AOG's customers.

ORDER OF THE CORPORATION COMMISSION IS REVERSED IN PART AND AFFIRMED IN PART.

HARGRAVE, C.J., OPALA, V.C.J., and HODGES, SIMMS, DOOLIN, ALMA WILSON and SUMMERS, JJ., concur.

KAUGER, J., concurs specially.

**17.** *Gray Lines Tour, Co. v. Interstate Commerce Com.,* 824 F.2d 811, 814 (9th Cir.1987).

**18.** *Heffner,* 420 F.2d at 812.

**19.** We are not unmindful that the Attorney General had notice of the proceeding in which the refund to AOG's customers was to be considered and that in that notice, mention was made that rebasing of AOG's gas costs would be considered. However, because we herein hold that the notice itself was defective according to the Commission's own rules and because in any event no mention was made of the fact that AOG's line loss factor would be increased we find that such notice as was given was insufficient to appraise even the Attorney General. Accordingly, we distinguish this holding from *In re Regulation of Automatic Rate Adjustment Clauses,* 608 P.2d 544 (Okla.1980) wherein the court found that notice was adequate where the "Attorney General was present at the hearing with notice, representing those persons whom he now claims had no notice."

**20.** Record at 97–100.

**21.** Record at 98.

**22.** Record at 216.

KAUGER, Justice, with whom OPALA, V.C.J., joins concurring specially:

I agree that the Corporation Commission did not follow its rules when it failed to give notice by publication. Although publication may be available for the world to see, it is presumptuous to suppose that anyone could read all that is published to detect if something may be reported which affects his/her property interest.[1] Reason and good business practice require that we assume: 1) that the appellee, Arkansas Oklahoma Gas Corporation (AOG), maintains a current list of the very parties who will be most impacted by a rate increase—its customers—and that it sends them bills on a regular basis; and 2) that notice could be enclosed with regular mailings without any undue burden on AOG.

In *Cate v. Archon Oil Co.*, 695 P.2d 1352, 1356 (Okla.1985), we acknowledged that neither necessity nor efficiency can abrogate the rule that, within the limits of practicability, notice must be reasonably calculated to reach the interested parties. If the names of those affected by a proceeding are available, the reasons disappear for resorting to means less likely than the mails to apprise them of possible action.[2] Under these circumstances, anything less than notice by mail is a violation of due process when, as here, the party charged with the duty of notification regularly sends bills to its customers—the same parties which are impacted by the rate change.

1. *Cate v. Archon Oil Co.*, 695 P.2d 1352, 1356 (Okla.1985).

2. *Greene v. Lindsey*, 456 U.S. 444, 455, 102 S.Ct. 1874, 1880, 72 L.Ed.2d 249, 258–59 (1982); *Schroeder v. City of New York*, 371 U.S. 208, 213, 83 S.Ct. 279, 282, 9 L.Ed.2d 255, 259, 89 A.L.R.2d 1398, 1403 (1962); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 318–20, 70 S.Ct. 652, 659–60, 94 L.Ed. 865, 875–76 (1949); *Cate v. Archon Oil Co.*, see note 1, supra.

OPALA, Vice Chief Justice, concurring.

The court holds that the Corporation Commission's (agency) failure to follow its procedural norms—which require that notice by publication be given of any proposed alteration in a public utility's rate charges—cannot be judicially sanctioned in the absence of some reasonable explanation. Applying the *Accardi*[1] doctrine to the Commission's unexplained departure from its procedural rules, the court reverses the agency order allowing a rate increase.

I

ORDERLY PROCEDURE IS A *SINE QUA NON* OF FUNDAMENTAL FAIRNESS

I wholeheartedly welcome the birth of today's teaching. It reinforces my own commitment to the notion that fundamental fairness cannot be afforded by any adjudicative process, administrative or judicial, except within a framework of orderly procedure. No area of law may lay claim to exemption from the basic strictures of structured practice[2]—not even the law governing utility rate making. Proposed alterations in a public utility's charges are regulated by the Commission's rule-governed process.[3] Unbounded freedom to depart at will from this ordered system will inevitably bring about chaos, caprice and

1. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 [1954].

2. *Pryse Monument Co. v. District Court, Etc.*, Okl., 595 P.2d 435, 438 [1979]; *Special Indemn. Fund v. Washburn*, Okl., 722 P.2d 1204, 1211 [1986] (Opala, J., dissenting.).

3. Corporation Commission Rule 8–27(B) provides:

"Notice of hearing of an application for approval of any schedule, rate, charge, classification, rule or regulation which will directly or indirectly *alter charges* made for service performed, *shall be published* once each week for two (2) consecutive weeks at least fifteen (15) days prior to hearing in a newspaper of general circulation published in each county in which are located utility customers affected thereby, unless the Commission directs otherwise." [Emphasis mine.]

*ad hoc* decisions.[4] "It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under the law."[5] *This court should never claim for itself nor for any adjudicative institution of government—court or agency—unrestrained freedom from the applicable rule-imposed procedural regime.*[6]

## II

### THE *ACCARDI* DOCTRINE SHOULD BE EXTENDED TO ALL PROCEDURAL RULES GOVERNING AGENCY PROCEEDINGS

Procedural rules, *once adopted by a court or agency,* should be applied mechanically to avoid the uncertainties that arise when exceptions are created.[7] Departure from any rule-imposed procedural regime must be accompanied by a reasoned explanation. This, in essence, is the *"Accardi*

doctrine" we embrace today. The agency action invalidated in *Accardi* violated procedural regulations having the force of law, which the Attorney General had promulgated pursuant to his congressionally conferred authority.[8] *Accardi's* actual teaching is more narrow than that made in our pronouncement in this case. It extends *only to rules directly authorized by legislatively enacted norms.*[9] If I were writing for the majority, I would today explicitly extend *Accardi,* as the court seems to have done implicitly, to *all procedural norms* that govern an agency's adjudicative process, whether they implement *specific* statutory policy or, as in the case before us, only a *general* grant of power to regulate procedure.[10]

Whenever an agency fails to comply with one of its procedural rules that is applicable in a given situation at hand, the agency must give a reasoned explanation, on the record, why it refuses to follow the rule's binding force. *No countenance should ever be given to an ad hoc departure from*

---

**4.** *Pryse Monument Co. v. District Court, Etc., supra* note 2 at 438.

**5.** *Joint Anti–Fascist Refugee Committee v. McGrath,* (Douglas, J., concurring), 341 U.S. 123, 179, 71 S.Ct. 624, 652, 95 L.Ed. 817 [1951].

**6.** Special Indemn. *Fund v. Washburn, supra* note 2 at 1212. In *Washburn* the court granted review by certiorari even though petitioner's rehearing quest had been filed too late to receive consideration before the Court of Appeals. My dissent points out that certiorari is regulated by a rule-governed process and that on review of a rehearing dismissal this court "should not claim for itself unrestrained freedom from any rule-imposed impediment. The process of choosing cases for certiorari review should not become a game of chance in which favor is dispensed only to those who are singled out as worthy of the court's largesse."

**7.** See *United States v. Indrelunas,* 411 U.S. 216, 222–223, 93 S.Ct. 1562, 1565, 36 L.Ed.2d 202 [1973] (procedural rules must be applied mechanically to avoid the uncertainties that arise when exceptions are created); *Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 108 S.Ct. 2405, 2407–2409, 101 L.Ed.2d 285 [1988]; *Bane v. Anderson, Bryant & Co.,* Okl., 786 P.2d 1230, 1238, n. 1 [1990] (Opala, V.C.J., concurring in part and dissenting in part).

**8.** In *Accardi, supra* note 1, the Board of Immigration violated a regulation which prescribed the procedure to be followed in processing an

alien's application for suspension of deportation.

**9.** In *United States v. Heffner,* 420 F.2d 809, 811 [4th Cir.1969], the court gave *Accardi* a broader sweep than that which follows directly from its teaching. *Heffner* applied *Accardi* to *all* of the agency's binding procedural rules, whether legislatively authorized or not.

**10.** The view we adopt today does not meet with unanimous support of national jurisprudence. Well-recognized distinctions are often made between legislative, interpretative and procedural rules. The last two categories of rules are not always given the force of law whose breach will invariably spawn reversal of agency's action. "A *legislative rule* is the product of an exercise of legislative power by an administrative agency, pursuant to a grant of legislative power by the legislative body" and is "as binding upon a court as a statute if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable." K.C. Davis, 1 *Administrative Law Treatise* § 5.03 at 299 [1958]; see also 1 F.E. Cooper, *State Administrative Law* 264 [1965]. Procedural rules, when rested on legislatively generated norms, are generally classified as legislative rules. See *Davis, supra,* § 5.03 at 299. Procedural rules falling into this category have been given binding effect, see, e.g., *Accardi, supra* note 8, 347 U.S. at 265–267, 74 S.Ct. at 502–503; *Service v. Dulles,* 354 U.S. 363, 380, 77 S.Ct. 1152, 1161, 1 L.Ed.2d 1403 [1957], *but see American Farm Lines v. Black*

*the course of an applicable procedural regime. Such action would inevitably result in inconsistent adjudicative behavior, whether by an agency or a court.* Fundamental fairness inexorably requires uniform treatment of all persons confronted by a like procedural context.

## III

## MANDATORY UNIFORMITY OF PROCEDURE UNDER THIS STATE'S FUNDAMENTAL LAW

Rules invocable in the course of an agency's adjudicative process have the same binding force as do court rules affecting forensic judicature. Courts and agencies alike must hold themselves powerless to grant dispensation from obedience to any self-generated norms of procedure which clearly command in any given posture.[11] Uniformity of procedure is plainly mandated by Art. 5, § 46, Okl. Const.[12] *Just as the legislature itself is powerless to regulate procedure by legal norms not uniformly applicable—i.e., those lacking across-the-board application, but having only "local or special" impact*[13]*—so are the courts as well as all other adjudica-*

*Ball Freight Service,* 397 U.S. 532, 539–540, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 [1970].
*Interpretative rules* are those which do not rest upon a legislative grant of law-making power. *Davis, supra,* §§ 5.03 and 5.11 at 300–306 and 358. The validity of interpretative rules is subject to challenge in any court proceeding in which their application may be in question. "Interpretative rules may interpret (1) a statute, (2) a legislative rule, (3) another interpretative rule, (4) judicial decisions, (5) administrative decisions, (6) administrative rulings, (7) any other law or interpretation, (8) any combination of items on this list, or (9) nothing." *Davis, supra,* § 5.03 at 304. The weight to be given interpretative rules varies from case to case. The decision usually rests upon a plurality of factors, of which the content of the rule is but one. See *Davis, supra,* § 5.03 at 300, where the author enumerates factors which have some bearing upon whether an interpretative rule has the force of law.
*Procedural rules* that are *not* adopted pursuant to legislatively prescribed norms fall outside the class of legislative rules. See *Cooper, supra* at 266. A nonlegislative procedural rule is one that implements a general, rather than a statutory, grant of rule-making authority to an agency. *But cf. Davis, supra,* § 5.03, in which the text classifies as legislative any procedural rule designed to govern the agency's own proceedings, whether specific power is granted to issue it or not. The weight accorded nonlegislative procedural rules generally depends upon the circumstances of the case. See *Cooper, supra* at 266–270.
Without distinguishing between legislative and procedural rules, some textwriters have noted various exceptions to the general rule that validly promulgated rules and regulations have the full force and effect of law. See Mezines, Stein, and Gruff, 3 *Administrative Law* § 13.03[2] [Feb.1990 cum.supp.]. Some courts have not applied this principle to agency violations that are intended to regulate *internal agency procedures* rather than to protect any interest of the objecting party. *First State Bank of Hudson County v. U.S.,* 599 F.2d 558 [3rd Cir.1979], cert. denied, 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 [1980], and cases cited in *Mezines, Stein and Gruff, supra* at § 13.03[2], n. 5. Courts for the most part have not allowed agencies to violate rules that were promulgated to benefit a party, either by entitling him to a substantive benefit or exemption or to a procedural safeguard. See, e.g., *Vitarelli v. Seaton,* 359 U.S. 535, 540, 79 S.Ct. 968, 973, 3 L.Ed.2d 1012 [1959]; *Flores v. Bowen,* 790 F.2d 740, 742 [9th Cir.1986]. The courts have held that an administrative agency may make *ad hoc* changes that relax or modify its *procedural rules* as long as that action does not injure or substantially prejudice the complaining party. See *United States v. Caceres,* 440 U.S. 741, 754–756, 99 S.Ct. 1465, 1472–1473, 59 L.Ed.2d 733 [1979]; *American Farm Lines v. Black Ball Freight Service, supra; Mezines, Stein and Gruff, supra* at § 13.03[2], n 9.

11. Adjective rules "internally" spawned or "institutionally" fashioned by agencies or courts are "self-generated" norms of procedure.

12. The terms of Art. 5, § 46, Okl. Const., provide in pertinent part:

   "The Legislature shall not ... pass any local or special law authorizing:

   \*   \*   \*   \*   \*   \*

   Regulating the practice ... in judicial proceedings or inquiry before the courts, ... commissioners, arbitrators, or other tribunals...."

13. See *Maule v. Independent School Dist. No. 9,* Okl., 714 P.2d 198, 203–204 [1986], citing *Ind. School Dist. v. Okl. City Fed. of Tchrs.,* Okl., 612 P.2d 719, 725–726 [1980] (Opala, J., dissenting); *Reynolds v. Porter,* Okl., 760 P.2d 816, 821–824 [1988].

*tive agencies of government.*[14] *Any* adjudicator's at-will departure from a governing rule of adjective law is in plain contravention of our constitution's prescription against unequal treatment through the use of a discriminatory regime of procedure.

I therefore enthusiastically join today in enforcing fidelity and obedience to an agency's procedural regime by our reversal of the Commission's flawed order.[15]

**14.** See *Howard v. T.G. & Y. Stores, Inc.,* Okl., 725 P.2d 1262 [1986], in which the trial judge's order was reversed for failure to comply with the strictures of an applicable procedural rule that dealt with admissibility of an untimely-tendered medical report. As I view *Howard,* it extends the *Accardi* doctrine to those judicial proceedings in which a court-fashioned norm of procedure was ignored or disregarded to a litigant's prejudice.

**15.** While I agree the Commission's order under review today is correctly reversed for failing to explain want of notice to the public utility's customers in accordance with the Commission rules, there is precedent for remanding a case to the agency so that it can supply reasons for its refusal to obey the rule's governing force. See, e.g., *Securities and Exchange Com. v. Chenery Corp.,* 318 U.S. 80, 94–95, 63 S.Ct. 454, 462, 87 L.Ed. 626 [1943], agency decision aff'd after remand, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 [1947]; *F.T.C. v. Crowther,* 430 F.2d 510, 514–516 [D.C.Cir.1970]; see also *Violations By Agencies of Their Own Regulations,* 87 Harv. L.Rev. 629 [1974].